UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  9-2-14

BERNARD B. IDLISAN,

                    Plaintiff,

- against -

MOUNT SINAI MEDICAL CENTER,

                    Defendant.

**REPORT AND
RECOMMENDATION**

**12-CV-8935 (PAC) (RLE)**

To the HONORABLE PAUL A. CROTTY:

## I. INTRODUCTION

*Pro se* Plaintiff Bernard Idlisan ("Idlisan") commenced this action against Mt. Sinai Medical Center ("Mt. Sinai" or the "Hospital"), claiming employment discrimination pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e-2000e-17, and the Americans with Disabilities Act, 42 U.S.C. §§ 12112-12117.  Idlisan challenges a joint decision by the New York State Division of Human Rights ("NYSDHR") and the U.S. Equal Employment Opportunity Commission ("EEOC"), finding that he was not subject to discriminatory hiring practices by Mt. Sinai.  He argues that Mt. Sinai discriminated against him by failing to hire him because of his race, national origin, disability, and conviction history.  On January 6, 2014, Idlisan moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (Pl. Mem. Law for Summ. J. ("Pl. Mem.") 25.)  On February 13, 2014, Mt. Sinai cross-moved for summary judgment, asking the Court to dismiss Idlisan's Complaint.  (Def. Mem. Law for Summ. J. ("Def. Mem.").)  For the reasons that follow, I recommend that Idlisan's motion be **DENIED**, and that Mt. Sinai's motion be **GRANTED** in part and **DENIED** in part.

## II. BACKGROUND

### A.    Factual and Procedural History

On December 27, 2011, Idlisan sent a letter to Mt. Sinai that expressed his concern that he had been subjected to discriminatory hiring practices by the Hospital because of his disability, race, national origin, and criminal convictions. (*See* Pl. Mem. Ex. P.)  On January 24, 2012, Jeff Cohen ("Cohen"), the Vice President of Labor Relations at Mt. Sinai, denied all of Idlisan's allegations. (*See* Pl. Mem. Ex. Q.)

Idlisan filed a formal complaint of employment discrimination against Mt. Sinai with the NYSDHR on March 5, 2012. (*See* Pl. Mem. Ex. R at 7.)  He indicated that he was discriminated against because of his race, national origin, disability, and criminal record. (Pl. Mem. Ex. R at 4.)  On March 16, 2012, the NYSDHR sent Idlisan a reply letter that stated his case would be investigated and dual-filed with the EEOC. (*See* Pl. Mem. Ex. S.)  On August 2, 2012, the NYSDHR determined there was "no probable cause to believe that [Mt. Sinai] engaged in . . . unlawful discriminatory practice." (*See* Pl. Mem. Ex. W at 1.)  Idlisan requested review of the decision by the EEOC on August 28, 2012. (*See* Pl. Mem. Ex. X.)  On September 21, 2012, the EEOC adopted the NYSDHR's finding, and issued a Notice of Right to Sue Letter. (*See* Pl. Mem. Ex. Y.)  Idlisan filed this action in federal court on November 21, 2012, within ninety days of receiving the Notice of Right to Sue Letter.

### B.    Mt. Sinai's Hiring Policies & Practices

#### 1.    Mt. Sinai's Hiring Policies

Mt. Sinai has several codified hiring and recruitment policies. (*See* Decl. Valerie Orellana ("Orellana Decl.") Ex. 2-3.)  Mt. Sinai's General Human Resources Policy #1.2 states that the Hospital gives "equal opportunity" to all applicants regardless of "race, creed, color,

2

religion, national origin, age, gender, disability, marital status, sexual orientation, veteran status or citizenship status." (Orellana Decl. ¶ 4; Orellana Decl. Ex. 1.) The Hospital selects applicants based only on "demonstrated ability and qualifications for the job." (*Id.*)

Mt. Sinai's Human Resources Policy further states that the Recruitment and Staffing Department (the "Department") is responsible for recruiting and screening all applicants for every position, except nurses, and that it makes "every effort to fill [vacant] positions from within" and gives preference to internal candidates. (Orellana Decl. ¶ 6; Orellana Decl. Ex. 2.) Recruitment Policy #2.6(B) states that the Department also "makes every effort to list [vacant] positions with as many public resources as possible." (Orellana Decl. ¶ 7; Orellana Decl. Ex. 2.) The Department is also responsible for advertising vacant positions. (Orellana Decl. ¶ 10; Orellana Decl. Ex 2.)

### 2.    Mt. Sinai's Hiring Practices

Mt. Sinai also has recruitment practices that are not formally codified. The Department posts vacant positions exclusively for Hospital employees for seven days. (Orellana Decl. ¶ 6.) Candidates referred by current employees are considered internal candidates and are given "preferential treatment" during this seven-day window. (*Id.*) If there are no qualified internal candidates, an announcement about the vacant position is sent to 1199 Service Employees International Union, United Healthcare Workers East ("1199"), as required by a collective bargaining agreement ("CBA") between the Hospital and 1199. (*Id.* at ¶ 7.) The CBA requires laid-off union members be given preferential hiring status. (*Id.*)

If no internal candidate or 1199 member is qualified for a vacant position, the Department advertises the position externally with public employment agencies and on the Hospital's website. (*Id.* at ¶ 10.) One of the public employment agencies from which the

3

Hospital regularly hires is the Doe Fund, a not-for-profit organization that assists formerly incarcerated people find employment. (*Id.*; Decl. Jeff Cohen ("Cohen Decl.") ¶ 3.)

Members of the Department review applications for all positions in the order in which they are received. (Decl. Nana Yeboah ("Yeboah Decl.") ¶ 4; Decl. Agnes LaCalamito ("LaCalamito Decl.") ¶ 4.) Department members then send the applications of qualified candidates to hiring managers, who determine which candidates will be interviewed. (Yeboah Decl. ¶ 5; LaCalamito Decl. ¶ 5.) At no point during the application process do Department members or hiring managers have access to the information disclosed in the Voluntary Survey, in which applicants are asked to identify their gender and race. (Orellana Decl. ¶ 13; Pl. Mem. Ex. a.)

**C.     Idlisan's Applications to Mt. Sinai Medical Center**

Idlisan applied to eight positions at Mt. Sinai. (Pl. Mem. Ex. P4.) For each application, he used the same online application form, in which he disclosed his education, work history, race, national origin, physical disability, and criminal convictions. (Pl. Mem. Ex. b.)

**1.     Idlisan's Disclosed Education and Work History**

When prompted to describe his education on Mt. Sinai's employment application, Idlisan indicated that he received his bachelor's degree in accounting in 1978 from Zamboanga AE Colleges in the Philippines. (Pl. Mem. Ex. b at 1.) He obtained a computer-assisted bookkeeping certificate from Correspondence School in 1997 and a GED from the New York Department of Education in 2008. (*Id.*)

In the "work history" portion of the application, Idlisan described the positions he held from 1986 through 2012. (Pl. Mem. Ex. b at 2-4.) From March 1986 through July 1993, he worked for the Philippine Children's Medical Center as a medical records officer, a position he

4

left when he immigrated to the United States. (*Id.* at 4.) From September 1994 through July 2001, he worked for Jamaica Furniture Company in Queens, New York, as a bookkeeper, and was laid off when the company went out of business. (*Id.* at 3-4.) From July through September 2001, Idlisan worked for the Unites States Postal Service in Queens, New York, as a data conversion operator, but resigned to return to the Philippines. (*Id.* at 3.) From 2001 through 2010, Idlisan was unemployed. (*Id.* at 4-5.) From May 2010 through August 2010, he worked as a front desk clerk at Fort Greene Action Center in Brooklyn, New York, but left this position because of a medical condition. (*Id.* at 3.) He was employed at the time of his application by the New York Board of Elections, where he has worked as an information clerk on a part-time basis since August 2010. (Pl. Mem. Ex. b at 2.)

## 2.    Idlisan's Disclosed Personal Information

As part of his application, Idlisan completed a Voluntary Survey, which the Hospital uses for "research, reporting, statistical purposes, and to monitor legal compliance." (Pl. Mem. Ex. a.) On this survey, Idlisan indicated that he identifies his race as Asian and his gender as male. (*Id.*) When prompted to explain gaps in his employment, Idlisan wrote that he left his position with Philippine Children's Medical Center because he "migrated to the United States of America," and that he left his position with the United States Postal Service to go to his "home country, the Philippines." (Pl. Mem. Ex. b at 4-5.) He also indicated that he is a United States citizen, and that he currently resides in Brooklyn, New York. (Pl. Mem. Ex. b, OO, PP.)

In response to a question asking whether the applicant had ever been convicted of a crime or offense, Idlisan wrote that he was convicted of bail jumping on November 13, 2007, and of second-degree grand larceny on December 18, 2007. (Pl. Mem. Ex. b at 5-6; Pl. Mem. Ex. G at 2.) He served two years in prison and was released on parole on May 19, 2009. (*Id.*) Idlisan

was discharged from parole on May 19, 2011, and the Department of Corrections and

Community Supervision granted him a Certificate of Good Conduct on December 5, 2012.  (Pl.

Mem. Ex. F, G.)

Idlisan further disclosed on his application that he suffered from a physical disability.

(Pl. Mem. Ex. b at 3.)  When the application prompted him to explain why he left one of his

former positions, Idlisan wrote that he "voluntarily resigned" because his "triple vessel heart

disease" left him disabled.  (*Id.*)  Idlisan's treating physician, Dr. Michael Avaricio ("Dr.

Avaricio"), diagnosed Idlisan with this condition on August 31, 2010, and wrote in his treatment

notes that Idlisan was a candidate for open-heart surgery who should avoid physical activity.  (Pl.

Mem. Ex. A, D.)  On December 13, 2010, Dr. Avaricio opined in a Treating Physician's

Wellness Plan Report[1] that Idlisan suffered from high cholesterol, high blood pressure, and

coronary artery disease, conditions that rendered him unable to work for at least twelve months.

(Pl. Mem. Ex. C.)  On May 25, 2011, Dr. Avaricio completed a Certificate of Disability and Job

Readiness, in which he opined that Idlisan had a physical disability but was "job ready and likely

to succeed in performing the duties of an Accounting Clerk or any clerical position."  (Pl. Mem.

Ex. E.)

### 3.        Positions to Which Idlisan Applied

Between April 20, 2010, and February 6, 2012, Idlisan submitted applications to Mt.

Sinai for eight externally advertised positions: an accounting clerk position, an accounts payable

receivable clerk position, an officer supervisor position, two business associate positions, an

office assistant position, and two accounting clerk positions.  (Pl. Mem. Ex. P4.)  He was not

granted interviews for any position.  (*Id.*)

---

[1] This report was submitted to the New York City Human Resources Administration as part of Idlisan's application
to the public assistance program.  (Pl. Ex. C.)

### a.     2010 Accounting Clerk Position

On April 20, 2010, Idlisan applied online for an accounting clerk position. (Pl. Mem. Ex. P4.) The position was never filled for financial reasons. (Orellana Decl. ¶ 14.)

### b.     Accounts Payable Receivable Clerk Position

On April 30, 2010, Idlisan applied online for an accounts payable receivable clerk position. (Pl. Mem. Ex. P4.) The job posting provided that the following qualifications were required: high school diploma; one year of relevant experience; and good computer skills. (Orellana Decl. Ex. 3.) This position was filled by K.H.,[2] who applied for the position on May 14, 2010. (Orellana Decl. Ex. 4.) K.H. had a high school diploma and nine years of related experience at the time of her application. (*Id.*) She was referred by 1199, and online applicants were not screened for this position. (Orellana Decl. ¶ 15.)

### c.     Office Supervisor Position

On May 27, 2010, Idlisan applied online for an office supervisor position in the Division of Vascular Surgery. (Pl. Mem. Ex. P4.) The only qualification listed in the job posting was "associate or bachelor's degree preferred." (Orellana Decl. Ex. 5.) This position was filled by K.P., who applied on June 9, 2010. (*Id.*) K.P. had her master's degree in healthcare administration at the time of her application. (*Id.*) She was referred by a current employee; online candidates were not screened. (Orellana Decl. ¶ 15; Orellana Decl. Ex. 5.)

### d.     Business Associate Positions

On August 14, 2011, Idlisan applied online for two business associate positions. (Pl. Mem. Ex. P4.) The job posting listed the following necessary qualifications: minimum education of high school or GED; proven data entry and basic computer skills; medical database

---

[2] Because of the personal information disclosed, the hired applicants are referred to by their initials.

7

experience; clerical skills; proven customer service experience in a healthcare environment; and at least six months healthcare related experience.  (Orellana Decl. Ex. 7; Yeboah Decl. Ex. 1.)

One of these positions was filled by E.P., who was a Mt. Sinai 1199 member when she applied.  (Orellana Decl. ¶ 17; Orellana Decl. Ex. 8.)  Her position as a clerk in the medical records department was eliminated because of downsizing, and her application was given preference pursuant to the Hospital's CBA with 1199.  (Orellana Decl. ¶ 17.)

Because no internal or 1199 candidates were qualified for the other business associate position, the recruiter reviewed online applications.  (Yeboah Decl. ¶ 9.)  The position was filled by external candidate, L.C., who applied on September 7, 2011.  (*Id.*; Yeboah Decl. Ex. 2.)  L.C. had completed some college coursework and had four months of clerical experience when he applied, but had no experience in the healthcare field.  (*Id.*)  He disclosed a criminal conviction for criminal possession of marijuana on his application.  (*Id.*)

### e.    Office Assistant Position

On December 27, 2011, Idlisan applied for an office assistant position.  (Pl. Mem. Ex. P4.)  The only necessary qualification for this position was a high school diploma or GED.  (Orellana Decl. Ex. 9.)  This position was filled by P.T., who applied on December 28, 2011.  (Orellana Decl. ¶ 18; Orellana Decl. Ex. 10.)  She had a high school diploma and was a current Mt. Sinai employee when she applied.  (*Id.*)  P.T.'s application was given preferential treatment because she was an internal candidate.  (*Id.*)

### f.    2012 Accounting Clerk Positions

On February 6, 2012, Idlisan applied for two accounting clerk positions.  (Pl. Mem. Ex. P4.)  The job posting for these positions identified the following necessary qualifications: high school diploma or GED; excellent communication skills (oral and written); and the ability to

work independently and on a team. (Orellana Decl. Ex. 11; LaCalamito Decl. Ex. 1.)

One of these positions was filled by N.S., who applied on March 15, 2012. (Orellana Decl. ¶ 19; Orellana Decl. Ex. 2.) N.S. had his GED and six months of experience working in an accounts receivable department. (*Id.*) He was referred by 1199, and his application was given preference under Mt. Sinai's CBA. (Orellana Decl. ¶ 19.)

No internal candidates or 1199 candidates were qualified for the other accounting clerk position, and the recruiter reviewed online applications. (LaCalamito Decl. ¶ 9.) The position was filled by external candidate, A.E.F., who applied on February 24, 2012. (*Id.*; LaCalamito Decl. Ex. 2.) She possessed an associate's degree and four years of experience working in accounts management when she applied. (LaCalamito Decl. Ex. 2.) A current Mt. Sinai employee recommended A.E.F. for the position. (LaCalamito Decl. ¶ 9.)

## III. DISCUSSION

### A.    Timeliness

A plaintiff must file an administrative complaint with the EEOC before filing a Title VII action in district court. *See* 42 U.S.C. § 2000e-5(e); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-03 (1973). In New York, the statute of limitations for filing a charge of discrimination with the EEOC is 300 days after the alleged discrimination. *See* 42 U.S.C. § 2000e-5(e); *Pikulin v. City Univ. of N.Y.,* 176 F.3d 598, 599-601 (2d Cir. 1999). Charges received by one agency under a work-sharing agreement are deemed received by the other agency for purpose of determining the timeliness of the charge. 29 C.F.R. § 1626.10(c). The EEOC and the NYSDHR have a work-sharing agreement. *See Tewksbury v. Ottaway Newspapers*, 192 F.3d 322, 325 (2d Cir. 1999).

Here, three of Idlisan's claims must be dismissed because Idlisan failed to file his

complaints within the statute of limitations. Idlisan applied online for the accounting clerk position on April 20, 2010. (Pl. Mem. Ex. P4.) To be timely, he was required to file a complaint with the NYSDHR by February 14, 2011. He submitted an online application for the accounts payable receivable clerk position on April 30, 2010. To be timely, a complaint had to be filed by February 24, 2011. (*Id.*) He applied online for an office supervisor position on May 27, 2010. To be timely, a complaint had to be filed by March 23, 2011. (*Id.*) Idlisan filed all of his complaints with the NYSDHR on March 5, 2012, which was beyond the statute of limitations for these three positions. (Pl. Mem. Ex. R.) Therefore, with respect to his claims for the 2010 accounting clerk position, the accounts payable receivable position, and the office supervisor position, I recommend that Idlisan's motion for summary judgment be **DENIED**, and that Mt. Sinai's motion for summary judgment be **GRANTED**.

## B.   Standard for Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that a court shall grant a motion for summary judgment if it determines that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. Once the movant makes a properly supported motion, the nonmoving party must set forth specific facts showing that there is genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "In considering the motion, a court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *See Knight*

*v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir. 1986).  Summary judgment should be granted where

no reasonable trier of fact could find in favor of the moving party, *see H.L. Hayden Co. of N.Y.,*

*Inc. v. Seimens Med. Sys., Inc.*, 879 F.2d 1005, 1011 (2d Cir. 1989), thereby "dispos[ing] of

meritless claims before becoming entrenched in a frivolous and costly trial."  *See Donahue v.*

*Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 58 (2d Cir. 1987).

　　　When parties cross-move for summary judgment, the same standards apply.  *See Morales*

*v. Quintel Entm't, Inc.,* 249 F.3d 115, 121 (2d Cir. 2001).  "[E]ven when both parties move for

summary judgment, asserting the absence of any genuine issues of material fact, a court need not

enter judgment for either party."  *Id.* (citing *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461

(2d Cir. 1993)).  "[E]ach party's motion must be examined on its own merits, and in each case all

reasonable inferences must be drawn against the party whose motion is under consideration."

*Morales*, 249 F.3d at 121 (citing *Schwabenbauer v. Bd. of Educ.*, 667 F.2d 305, 314 (2d Cir.

1981).

**C.**　　**Idlisan's Title VII Claims[3]**

　　　　**1.**　　**Analytical Framework for Summary Judgment in Title VII Cases**

　　　Title VII prohibits employers from failing to or refusing to hire any individual "because

of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).

Discrimination cases based on circumstantial evidence brought pursuant to Title VII are analyzed

under the familiar three-part burden-shifting framework established in *McDonnell Douglas,* 411

U.S. at 802-03.

---

[3] Pursuant to Title VII and the ADA, Idlisan also bring claims based on his criminal conviction.  However, neither
Title VII nor the ADA protects against discrimination based on conviction status, and this Court is not aware of any
federal law that provides such protection.  Therefore, these claims are not analyzed in this Report and
Recommendation.

Under the first part of the burden-shifting framework, a plaintiff must establish a prima facie case of discrimination by showing that: (1) he is a member of a protected class; (2) he was qualified for the job for which he applied; (3) he was denied the job; and (4) the denial occurred in circumstances giving rise to an inference of discrimination on the basis of his membership in that class. *Stern v. Trustees of Columbia Univ. in N.Y.*, 131 F.3d 305, 312 (2d Cir. 1997) (citing *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254-55 (1981)). "This burden is not a heavy one." *Gorzynski v. Jetblue Airways Corp.,* 596 F.3d 93, 107 (2d Cir. 2010).

Under the second part, the burden shifts to the employer to articulate a legitimate non-discriminatory reason for its actions. *Burdine*, 450 U.S. at 254-55. Despite the shift of the burden of production to the defendant, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* at 253. This is so because the "employer has discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful criteria." *Id.* at 259.

Under the third part, if the defendant provides evidence of legitimate, non-discriminatory reasons for its action, the burden shifts back to the plaintiff to show by a preponderance of the evidence that the employer's reasons for failing to hire him are actually a pretext for discrimination. *Id.* at 253. A plaintiff opposing a motion for summary judgment must be able to show that "the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Stern,* 131 F.3d at 312.

## 2.    Idlisan's Prima Facie Case

Idlisan contends that he was subject to discriminatory hiring practices because of his race and national origin for the five remaining positions at issue – the office assistant position, two business associate positions, and two accounting clerk positions. To uphold his burden, Idlisan

must demonstrate that the four elements of a prima facie case of discrimination are satisfied. First, Idlisan must show that he is a member of a protected class within the meaning of the statute. *Stern*, 131 F.3d at 311. Idlisan identifies his race as Asian and his national origin as the Philippines. (Compl. at 3.) Because Title VII proscribes "discriminatory preference for any group, minority or majority," Idlisan has satisfied the first element by demonstrating that he belongs to two minority groups. *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971).

Second, Idlisan must establish that he was qualified for the positions to which he applied. *Stern*, 131 F.3d at 311. Of the positions to which Idlisan applied, the business associate position had the most stringent necessary qualifications, which were: minimum education of high school or GED; proven data entry and basic computer skills; medical database experience; clerical skills; proven customer service experience in a healthcare environment; and at least six months healthcare related experience. (Orellana Decl. Ex. 7; Yeboah Decl. Ex. 1.) At the time of his application, Idlisan possessed a bachelor's degree in accounting and a GED. (Pl. Mem. Ex. b at 1.) He had fifteen years of data entry experience, seven years of bookkeeping experience, and eight years of experience working in the healthcare industry. (*Id.*) Thus, Idlisan was qualified for the business associate positions, as well as the positions with less stringent qualifications. The second element is satisfied.

Third, Idlisan must demonstrate that he was not hired for any of the remaining positions. *Stern*, 131 F.3d at 312. Because Idlisan was not granted an interview for any position with Mt. Sinai, the third element is easily met. (Pl. Mem. Ex. P4.)

Fourth, Idlisan must establish that the circumstances in which he was not hired can support an inference of discrimination on the basis of his race and national origin. *Stern*, 131 F.3d at 312. This element is typically established when the plaintiff shows that he was similarly

situated to the person hired, and that the person hired was outside the plaintiff's protected class. *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999). Here, however, Idlisan cannot draw an inference because Mt. Sinai did not disclose the race, national origin, or any demographic information of the individuals the Hospital hired. Mt. Sinai provided only the name, level of education, professional experiences, criminal record, and affiliations with the Hospital or 1199. (Orellana Decl. Ex. 2, 8, 10; Yeboah Decl. Ex. 2; LaCalamito Decl. Ex. 2.) Neither party presented information on the race or nationality of the individuals selected, although if this information favored Mt. Sinai, it is not clear why it has failed to point this out. The Court however, will not speculate on these facts for the purposes of summary judgment. Idlisan must be prepared to present evidence on this issue to prevail on his claims.

### 3.   Idlisan's Ability to Maintain his Burden Under the *McDonnell Douglas* Framework

However, even assuming that Idlisan is provided with the relevant information to establish a prima facie case, he can only maintain his burden under parts two and three of the burden-shifting framework for one of the accounting clerk positions and one of the business associate positions.

#### a.   Office Assistant Position Filled by P.T.

Under part two of the *McDonnell Douglas* framework, Mt. Sinai has provided legitimate, non-discriminatory reasons for not hiring Idlisan for the office assistant position. The Hospital hired P.T., who was a current Mt. Sinai employee when she applied. (Orellana Decl. ¶ 18; Orellana Decl. Ex. 9.) Mt. Sinai's written hiring policy expresses a preference for filling vacancies from within, and the Hospital has pointed to this policy to explain its decision not to hire Idlisan. (Orellana Decl. ¶ 6; Orellana Decl. Ex. 2.)

Idlisan has not met his burden under part three of the framework because he has failed to

provide evidence to show that Mt. Sinai's explanation was a pretext for discrimination. First, Idlisan presents no evidence to refute Mt. Sinai's policy that favors hiring internal candidates. While such a policy may be discriminatory when it has a discriminatory impact, *see Griggs v. Duke Power Co.*, 401 U.S. 424, 432 (1971), Idlisan has provided no evidence of discriminatory impact in the record. Additionally, Idlisan does not contest P.T.'s qualifications for the position. (Pl. Opp. Mem. 17-18.) Therefore, I recommend that, with respect to the Title VII claim for the office assistant position, Idlisan's motion for summary judgment be **DENIED**, and that Mt. Sinai's motion for summary judgment be **GRANTED**.

### b.   Accounting Clerk Position Filled by N.S.

Under part two of the framework, Mt. Sinai has provided legitimate, non-discriminatory reasons for not hiring Idlisan for the first accounting clerk position. The Hospital hired N.S., who was referred by 1199. (Orellana Decl. Ex. 2.) Mt. Sinai and 1199's CBA requires that the Hospital give preference to candidates referred by 1199, and the Hospital points to the CBA as the reason Idlisan was not hired for the position. (Orellana Decl. ¶ 7.)

Under part three of the *McDonnell Douglas* framework, Idlisan has not provided evidence to show that this explanation was a pretext for discrimination. He acknowledges that Mt. Sinai has a policy that favors hiring 1199 candidates, and does not contest N.S.'s qualifications for the position. (Pl. Opp. Mem. 17-18.) I therefore recommend that, with respect to the Title VII claim for the first accounting clerk position, Idlisan's motion for summary judgment be **DENIED**, and that Mt. Sinai's motion for summary judgment be **GRANTED**.

### c.   Accounting Clerk Position filled by A.E.F.

Under part two of the framework, Mt. Sinai has provided legitimate, non-discriminatory reasons for not hiring Idlisan for the accounting clerk position. Mt. Sinai stated that A.E.F. was

hired over Idlisan because her most recent employment directly related to the skills necessary for this position. (Def. Mem. 19.) A.E.F. was qualified for this position because she had her associate's degree and four years of experience working in accounts management at the time of her application. (LaCalamito Decl. Ex. 2.) Employers are granted discretion to apply subjective criteria in assessing potential employees' qualifications, *see Burdine,* 450 U.S. at 259, and the "recentness" of an applicant's work experience is a subjective criterion that sufficiently demonstrates that Mt. Sinai's hiring decision was not unlawful.

Under part three of the framework, Idlisan has met his burden. Idlisan claims that Mt. Sinai's reason for not hiring him is a pretext because he is comparatively more qualified than A.E.F. (Pl. Mem. Ex. V at 5.) In support of his argument, Idlisan notes that he possessed fifteen years of data entry experience and a bachelor's degree in accounting when he applied, whereas A.E.F. had eight months of data entry experience and an associate's degree in accounting. (*Id.*) To distinguish between the qualified applicants, Mt. Sinai relied on a subjective criterion: the recentness of A.E.F.'s work experience. This criterion, unlike the written Human Resources Policies or the CBA with 1199, is not part of a formal hospital hiring policy. Reasonable jurors could disagree with the Hospital's reliance on an unwritten subjective criterion in making hiring decisions. Because A.E.F. and Idlisan were both qualified for the accounting clerk position, their comparative qualifications remain a material fact at issue that should be resolved by a jury. Because there are factual issues that remain, I recommend that, with respect to the Title VII claim for the second accounting clerk position, Idlisan's motion for summary judgment be **DENIED**, and that Mt. Sinai's motion for summary judgment be **DENIED**.[4]

---

[4] The Court also notes the Second Circuit's cautious approach toward "granting summary judgment to an employer in a discrimination case where, as here, the merits turn on a dispute as to the employer's intent." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008); *see also Gorzynski*, 596 F.3d at 101.

### d.    Business Associate Position filled by E.P.

Under part two of *McDonnell Douglas* framework, Mt. Sinai has provided legitimate,
non-discriminatory reasons for not hiring Idlisan for the first business associate position.  The
Hospital hired E.P., who was a Mt. Sinai 1199 employee when she applied.  (Orellana Decl.
¶ 17; Orellana Decl. Ex. 8.)  Mt. Sinai's written hiring policy expresses a preference for filling
vacancies from within, and the CBA with 1199 requires the Hospital to give preferential
treatment to 1199 applicants.  (Orellana Decl. ¶¶ 6, 7; Orellana Decl. Ex. 2.)  Mt. Sinai's reliance
on its hiring policies provides a non-discriminatory reason for not hiring Idlisan.

Idlisan has not met his burden under part three, as he has not put forth evidence to show
that the Hospital's explanation was actually a pretext for discrimination.  He acknowledges that
Mt. Sinai has a policy that favors hiring internal candidates, and does not contest E.P.'s
qualifications for the position.  (Pl. Opp. Mem. 17-18.)  For this reason, I recommend that, with
respect to the Title VII claim for this position, Idlisan's motion for summary judgment be
**DENIED**, and that Mt. Sinai's motion for summary judgment be **GRANTED**.

### e.    Business Associate Position filled by L.C.

Under the second part of the framework, Mt. Sinai has provided legitimate, non-
discriminatory reasons for not hiring Idlisan for the second business associate position.  The
Hospital hired L.C., an external candidate who was not referred by 1199.  (Yeboah Decl. ¶ 9.)
L.C. had some college course work and clerical experience at the time of his application.  (*Id.*;
Yeboah Decl. Ex. 2.)  Mt. Sinai stated that L.C. was hired because his most recent employment
directly related to the skills necessary for this position.  (Def. Mem. 19.)  As explained above, in
section III.C.3.c., Mt. Sinai may use its discretion to determine that the recentness of an
applicant's work experience is a legitimate factor in hiring decisions.

17

Idlisan has carried his burden under part three of the *McDonnell Douglas* framework. The job description issued by Mt. Sinai stated that applicants needed "medical data base experience" and "at least six months healthcare related experience" to be qualified for the position. (Orellana Decl. Ex. 7; Yeboah Decl. Ex. 1.) Idlisan argues that he was more qualified for the position because L.C. did not have any experience in the healthcare industry, whereas Idlisan possessed eight years of relevant experience. (Pl. Mem. 24; Pl. Mem. Ex. b; Yeboah Decl. Ex. 2.) Hiring someone who does not meet the minimum qualifications is a questionable selection tactic that may actually serve as a pretext for unlawful discrimination on the basis of race or national origin.

Furthermore, it is unclear whether the Mt. Sinai recruiters were aware of Idlisan's race and national origin. Idlisan stated twice on his application that his "home country" is the Philippines, and disclosed his race on the confidential Voluntary Survey. (Pl. Mem. Ex. b.) Mt. Sinai maintains that its recruiters were unable to discern Idlisan's race from the Voluntary Survey. (Def. Mem. 19.) However, the Hospital has failed to address whether its recruiters were aware of Idlisan's national origin based on the statements provided in his application. This leaves an issue of fact unresolved. To prevail on his claims, Idlisan will need to establish that the recruiters were aware of his race and national origin. I recommend that, with respect to the Title VII claim for the business associate position filled by L.C., Idlisan's motion for summary judgment be **DENIED**, and that Mt. Sinai's motion for summary judgment be **DENIED**.

**D.      Idlisan's ADA Claims**

**1.      Analytical Framework for Summary Judgment in ADA Cases**

The ADA makes it unlawful for employers to "discriminate against a qualified individual on the basis of disability in regard to job application procedures [and] hiring," where a qualified

individual is one who "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. §§ 12111(8), 12112(a). The ADA covers individuals who have a "physical or mental impairment that substantially limits one or more major life activities of such individual," or who are "regarded as having such an impairment." *Id.* at § 12102(1). Similar to Title VII claims, discrimination cases based on circumstantial evidence brought pursuant to the ADA are analyzed under the burden-shifting *McDonnell Douglas* test. 411 U.S. at 802-03; *see also Raytheon Co. v. Hernandez,* 540 U.S. 44, 53 (2003) (stating that the *McDonnell Douglas* framework applies to both Title VII and ADA claims).

When there is only circumstantial evidence of discrimination, a plaintiff establishes a prima facie case of discrimination under the ADA showing that: (1) the employer is subject to the ADA; (2) he is disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential job functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability. *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 869-70 (2d Cir. 1998).

### 2.    Idlisan's Prima Facie Case

In addition to his Title VII claims, Idlisan contends that he was subjected to discriminatory hiring practices because of his disability, in violation of the ADA, for the five positions for which he filed timely claims – the office assistant position, the business associate positions, and the 2012 accounting clerk positions. (Compl. at 1.) Under the ADA, Idlisan must demonstrate that the four elements of a prima facie case of discrimination are satisfied. First, he must show that Mt. Sinai is subject to the ADA. *Ryan*, 135 F.3d at 869. An employer is subject to the ADA when it has "fifteen or more employees for each working day in each of twenty or

more calendar weeks in the current or preceding calendar year." 42 U.S.C. § 12111(5).  Mt. Sinai has over 20,000 employees working throughout the year.  (Orellana Decl. ¶ 2.)   Thus, Mt. Sinai is subject to the ADA and the first element is met.

Second, Idlisan must establish that he was disabled within the meaning of the ADA.  *Ryan*, 135 F.3d at 869.  To make a prima facie case of discrimination, a plaintiff must demonstrate how he is restricted from major life activities; conclusory declarations of disability are insufficient.  *See Cooney v. Consol. Edison*, 63 F. App'x. 579, 581 (2d Cir. 2003).  Here, Dr. Avaricio wrote in his Certificate of Disability and Job Readiness that Idlisan's heart disease was a physical disability but that he was "job ready."  (Pl. Mem. Ex. E.)  Idlisan did not submit any evidence to show that he was restricted from any major life activities when he applied to Mt. Sinai.  In the absence of such evidence, the Court will not infer that Idlisan was not disabled.  Whether Idlisan is disabled within the meaning of the ADA remains a material fact at issue.

Even if Idlisan were not disabled within the meaning of the ADA, he could still satisfy the second element by showing that he was perceived as disabled.  42 U.S.C. § 12102(1).  Idlisan indicated on his application that he resigned from a former position because of the disability caused by his triple vessel heart disease.  (Pl. Mem. Ex. b at 3.)  Although Mt. Sinai maintains that Idlisan cannot show that its recruiters were aware of his disability, the Hospital has failed to indicate whether the recruiters read the relevant portion of Idlisan's application.  (Def. Opp. Mem. 21.)  Therefore, whether Idlisan was perceived as disabled is a material fact at issue.  I recommend that, with respect to the ADA claims for the office assistant position, both business associate positions, and both accounting clerk positions, Idlisan's motion for summary judgment be **DENIED**, and that Mt. Sinai's motion for summary judgment be **DENIED**.

## IV. CONCLUSION

For the reasons stated above, I recommend that:

(1) Idlisan's motion for summary judgment be **DENIED** for all causes of action;

(2) Mt. Sinai's summary judgment motion be **GRANTED** and that Idlisan's claims be **DISMISSED** with respect to the 2010 accounting clerk position, the accounts payable receivable position, and the office supervisor position;

(3) Mt. Sinai's summary judgment motion be **GRANTED** and that Idlisan's claims be **DISMISSED** on the Title VII claims for the office assistant position filled by P.T., the 2012 accounting clerk position filled by N.S., and the business associate position filled by E.P.;

(4) Mt. Sinai's summary judgment motion be **DENIED** on the Title VII claims for the 2012 accounting clerk position filled by A.E.F. and the business associate position filled by L.C.;

(5) Mt. Sinai's summary judgment motion be **DENIED** on the ADA claims for the office assistant position filled by P.T., the 2012 accounting clerk positions filled by N.S. and A.E.F., and the business associate positions filled by E.P. and L.C.

I therefore recommend that the following claims move forward: the Title VII claims for the 2012 accounting clerk position filled by A.E.F. and for the business associate position filled by L.C.; and the ADA claims for all positions that were timely filed – the office assistant position filled by P.T., the 2012 accounting clerk positions filled by N.S. and A.E.F., and the business associate positions filled by E.P. and L.C.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the Parties shall have fourteen (14) days after being served with a copy of the recommended disposition to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies delivered to the chambers of the Honorable Paul A. Crotty, 500 Pearl Street, Room 1350 and to chambers of the undersigned, 500 Pearl Street, Room 1970. Failure to file timely objections shall constitute a waiver of those

objections in both the District Court and on later appeal to the United States Court of

Appeals.  *See Thomas v. Arn,* 746 U.S. 140, 150 (1985); *Small v. Sec'y of Health & Human*

*Servs.,* 892 F. 2d 15, 16 (2d Cir. 1989) (per curiam); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72,

6(a), 6(d).

**DATED: August 29, 2014**
**New York, New York**

Respectfully Submitted,

The Honorable Ronald L. Ellis
United States Magistrate Judge